UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RAMIL VENTURA PALAFOX<br>  a/k/a "RV Palafox,"<br><br><br>*Defendant.* | Case No. 1:25-cr-52<br><br>The Honorable Leonie M. Brinkema |

## MEMORANDUM IN SUPPORT OF MOTION REQEUSTING PRETRIAL DETENTION

Pursuant to 18 U.S.C. § 3145(a)(1), the United States filed a motion for a review of the order of release issued by a United States Magistrate Judge in Central District of California. The United States provides this memorandum in support of that motion. The defendant, Ramil Ventura Palafox, has stolen tens of millions of dollars; has taken active steps to hide these assets both domestically and overseas, where he has substantial ties; and has actively sought to monitor the Government's arrest efforts. As the defendant poses a serious risk of flight and danger to the community, and as there is no condition or combination of conditions that will reasonably assure his appearance or the safety of the community, he should be detained pending trial. In the event Court disagrees as to the necessity of detention, it should restrict the defendant to his residence and impose a multi-million dollar secured bond.

### I. PROCEDURAL POSTURE

On April 9, 2025, the defendant was arrested pursuant to an arrest warrant issued in conjunction with the indictment in this case. On April 10, 2025, a detention hearing was held in the Central District of California before United States Magistrate Judge Michael Kaufman. Judge Kaufman ordered Palafox released on a $50,000 appearance bond, that he deed the property for

1

20366 Via Galileo Porter Ranch, California 91326, and that he participate in location monitoring, among other standard conditions.

The United States appeals to this Court, as the court of original jurisdiction over the offense, and requests reversal of the Magistrate Judge's order of release and an order that the defendant be detained or in the alternative that the Court impose additional restrictions that will guarantee his appearance and the safety of the community.

## II. LEGAL STANDARD

The government seeks review of the Magistrate Judge's ruling pursuant to 18 U.S.C. § 3145(a)(1). This provision provides that a court with "original jurisdiction over the offense" may review the release order of a magistrate judge. 18 U.S.C. § 3145(a)(1). On review, the district judge acts *de novo* and makes an independent determination of the proper pretrial detention or conditions for release based on evidence presented to the magistrate judge and on additional evidence adduced before the district judge. *See United States v. Clark*, 865 F.2d 1433, 1436 (4th Cir. 1989); *see also United States v. Fortna*, 769 F.2d 243 (5th Cir. 1985).

The Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, sets forth the procedures for a district court to determine whether a defendant should be released or detained pending trial, sentence, or appeal. Under 18 U.S.C. § 3142(f)(2)(A), the judicial officer shall hold a detention hearing upon the government's motion in a case that involves "a serious risk that such person will flee." The "hallmark" of the Bail Reform Act is that an arrestee may be released on bail only under conditions which will "reasonably assure both the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(b), (c). If a judicial officer finds that "no condition or combination of conditions" will ensure both the defendant's appearance and the public's safety, then the officer "shall" order detention pending trial. *See* 18 U.S.C. § 3142(e)(1).

In this case, the United States seeks detention on the basis that Palafox poses a serious flight risk and submits that detention is necessary because of the defendant's acute risk of flight and danger to the community. *See id.* Detention on the basis of risk of flight requires the United States to prove by a preponderance of the evidence that no conditions of release would reasonably assure the defendant's appearance at trial. *See United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001). By contrast, detention on the basis of danger to the community must be established by "clear and convincing evidence." 18 U.S.C. § 3142(f)(2)(B). The evidence presented should speak to the factors enumerated in 18 U.S.C. § 3142(g), specifically the nature and circumstances of the offenses charged, the weight of the evidence, the history and characteristics of the defendant, and the nature and seriousness of the danger to any person or the community posed by the defendant's release. In presenting such evidence, the parties are not bound by the formal rules of admissibility, *see* 18 U.S.C. 3142(f), and evidence may be presented by way of proffer, *see United States v. Salerno*, 481 U.S. 739, 743 (1987).

### III. BACKGROUND

On March 13, 2025, a grand jury in the Eastern District of Virginia returned a true bill for an indictment against Palafox, charging him with eight counts of wire fraud, five counts of inducing interstate travel, one count of concealment money laundering, and nine counts of engaging in unlawful monetary transactions, in violation of 18 U.S.C. §§ 1343, 2314, 1956(a)(1)(B)(i), and 1957 respectively. ECF 1, Indictment.

The indictment alleges that from 2019 to 2021, Palafox organized and operated an international bitcoin investment platform, called Praetorian Group International ("PGI"). As part of the scheme, Palafox falsely promised that investors would earn 0.5 to 3% daily returns and that investors would double their money within six months. The Government has substantial video and

documentary evidence of the defendant making these representations, as well as testimonial evidence from multiple witness. In truth, PGI was a cryptocurrency Ponzi scheme that took in over $200 million from 90,000 investors worldwide. As early as February 2021, if not earlier, Palafox stopped paying many investors but continued to take new investor funds and to promise that investors' funds were earning returns, which they would be able to access. Palafox used investors' funds to pay other investors, to further promote the scheme, and for personal expenditures, including for the purchase of millions of dollars' worth of luxury goods, real estate, and at least 20 high-end vehicles. The details of Palafox's alleged fraudulent conduct, as well as the substantial evidence that is relevant to his detention are outlined in the Indictment and in Exhibit 1, Special Agent Christopher Truslow's Declaration ("the Truslow Decl.").

IV. **DISCUSSION**

  A. **Risk of Flight**

Palafox poses a substantial risk of flight. Over a two-year period, he owned, operated, and controlled a large multi-level marketing scam that induced tens of thousands of victims to "invest" hundreds of millions of dollars. Palafox not only directed the scheme, but he was its principal beneficiary, receiving over $30 million in fiat proceeds alone. Truslow Decl. ¶ 13. He also received millions of dollars in bitcoin and cash. *Id.* at ¶¶ 17-20; 26-28. Both forms of currency are easily transportable and transferrable, and thus can be used to facilitate flight.[1]

Palafox has an extensive history of international travel and has substantial ties to the Philippines. *Id.* at ¶¶ 35-37. He has family in the country and is a dual citizen, and as such, is able

---

[1] Digital currency can be stored and transported in "cold storage" wallets that are not connected to the internet and that may be no larger than a thumb drive. Palafox has been known to use cold storage wallets, and at least $7.9 million of the cryptocurrency that Palafox received from victims remains unaccounted for. Truslow Decl. ¶27.

to travel using a passport that may be unknown to the U.S. government. *Id.* at ¶¶ 35, 45, 46. Just prior to his arrest, Palafox was attempting to travel to Mexico. *Id.* at ¶¶ 45-48.

Palafox has also transferred substantial assets to the Philippines. In 2020 and 2021, Palafox controlled at least two bank accounts in the Philippines that each had balances of over $1 million. *Id.* at ¶¶ 21-24. Palafox did not disclose these foreign bank accounts to the Department of Treasury as required by law, *id.* at ¶ 25, and as such, the Government was unaware of their existence until this investigation revealed significant transfers, including of fraud proceeds, from Palafox's U.S.-based bank accounts to these accounts in the Philippines. The funds in these accounts appear to have been drawn down in 2021 by withdrawals and transfers by Palafox, and the current location of those funds is not known. *Id.* at ¶¶ 22-23. Moreover, Palafox was in the process of transferring luxury vehicles to the Philippines before they were seized by the Government. *Id.* at ¶ 36. Courts have recognized that detention is appropriate where a defendant demonstrates "substantial familiarity with the commercial and financial laws of other countries, sophistication in arranging international financial transactions and in moving money across borders, and a facility for concealing the existence and location of significant quantities of money and other assets." *United States v. Anderson*, 384 F.Supp.2d 32, 35 (D.D.C. 2005).

Palafox has undertaken other extensive steps to hide his assets and the alleged fraud proceeds. *See, e.g.*, Truslow Decl. at ¶¶ 12-16, 21-28. As alleged in Count 14 of the Indictment, Palafox utilized a family member to launder fraud proceeds to an account that he controlled in the Philippines. He purchased a residence in Los, Angeles, and titled it in his name and his spouse's name, before transferring ownership to a company controlled by one of his sons. Palafox also directed and caused to be directed approximately $11 million in victim funds through a bank

5

account in the name of a third-party company, Company 2, which he then directed to personal accounts that he controlled. *Id.* at ¶ 16.

The Government likewise has substantial concerns that Palafox was not candid with the Magistrate Judge in the original detention hearing regarding his true assets.[2] When arrested, Palafox and his spouse were driving a Mercedes Benz SUV, which is titled to Palafox's wife, *id.* at ¶ 49, and at the sentencing hearing, Palafox through counsel represented that he had "significant equity" in his Porter Ranch house. This house was purchased for approximately $1.6 million in February 2021 at the height of the fraud. *Id.* at ¶ 14. Palafox, likewise, represented at the hearing that he owned multiple rental properties in Las Vegas, Nevada and received rental income from these properties. *Id.* at ¶ 51. The Government does not know as of yet, which properties Palafox was referencing, but believes that these too might have been purchased with fraud proceeds.

With respect to the Porter Ranch home for which Palafox has allegedly offered to provide the deed to the court, Palafox, through counsel, represented that he and his spouse owned the property. *Id.* In truth, Porter Ranch property is not directly owned by Palafox and his spouse but by a limited liability company. The ownership of that LLC is opaque, though there are indications that third parties, including Palafox's son and possibly his sister may have or have had an interest in the LCC, given that they self-identified as "members" in corporate records from 2021. *Id.* at ¶¶ 53-54. Third parties have also indicated that Palafox transferred the Porter Ranch house to BBMR Threshold Inc. to hide his ownership of the asset. *Id.* at ¶ 55.

---

[2] Palafox claimed indigency and was represented at the hearing by a federal public defender, despite the fact that two other attorneys, who represented him in other matters, were present in the courtroom.

6

Palafox failed to disclose this information to the magistrate judge. Moreover, he failed to disclose that he purchased the home with proceeds from the fraud, and as such, the property may be seized by the Government if Palafox is convicted. *See id.* at ¶ 14. These facts undoubtedly would have had bearing on the magistrate judge's determination as to the suitability of the Porter Ranch property as an asset underlying the defendant's bond.

Palafox has also actively sought to monitor the status of law enforcement efforts to arrest him, repeatedly directing members of his security team to see if there was a warrant for his arrest, including specifically inquiring if there was "any warrant on a Federal level." *Id.* at ¶ 41. Separately, Palafox commented to his bodyguard that Dubai does not extradite individuals to the United States. *Id.* at ¶ 39. This is notable as Palafox has previously traveled to Dubai, *id.* at ¶ 37, and because bank records indicate that $150,000 was transferred from one of Praetorian Group International Trading Inc's bank account in the Philippines to Dubai for what appears to be the purchase of a condominium. *Id.* at ¶ 24. Though the Government is not aware of Palafox traveling to Dubai after making this comment to his bodyguard, he did travel to the Philippines, only returning back to the United States after assuring himself to the extent possible that he was not likely to be arrested. *Id.* at ¶¶ 40-41.

In sum, Palafox has substantial overseas ties, has actively sought to hide assets overseas, has the motive and means to travel, and has previously made comments expressing a desire to evade arrest and criminal process. His incentive to flee has only increased now that his fears have been realized and he has been charged. The evidence against Palafox is substantial and includes the testimony of victims and employees and his own videos and communications. Now that Palafox has been charged with multiple felonies that have 20-year maximum sentences and is

7

facing an anticipated guideline range of at least 108-135 months' imprisonment, the evidence indicates that he has an incentive, the means, and an intention to flee.[3]

This position is supported by controlling case law. In *United States v. Stewart*, the Fourth Circuit upheld a district court's decision to detain a defendant where tens millions of dollars from a Ponzi scheme had not been recovered and the defendant had surreptitiously transferred a portion of the unrecovered assets to offshore bank accounts, had used an alias to travel, and had knowledge of ways to evade the Government, among other factors. 19 F. App'x 46 (4th Cir. 2001).

The present case is a close analogue to *Stewart*. Palafox likewise received tens of millions of dollars, much of which is unaccounted for. He has transferred millions of dollars overseas, including through concealed means, and has received and controlled millions of dollars in digital currency, which is readily transported and hidden. The defendant has used third parties, including Company 2, to mask his receipt of funds, and has used the alias "Lance Ramiro," to mask his online presence. Truslow Decl. at ¶¶ 29-30. Moreover, the defendant recently booked a cruise to Mexico, despite the U.S. government possessing his passport. *Id.* at ¶¶46-47. In light of these facts, and consistent with controlling case law, the United States believes that it has more than established by a preponderance of the evidence that the defendant poses a serious flight risk and should be detained. *See also*, *United States v. Boustani*, 932 F.3d 79, 82 (2d Cir. 2019) (upholding detention because of the seriousness of the fraud offense, the strength of the Government's case, and the defendant's deceptive actions, access to substantial financial resources, and ties to foreign countries.); *United States v. Hong Vo*, 978 F. Supp. 2d 41, 49 (D.D.C. 2013) (similar).

---

[3] This calculation includes a fraud loss of over $25,000,000, which is highly conservative by the government's estimate, a six-point enhancement for causing substantial financial hardship to 25 or more victims, and a two-point enhancement for sophisticated means. *See* U.S.S.G. 2B1.1(b)1)(L); 2B1.1(b)(2)(C); and 2B1.1(b)(2)(10).

### B. Danger to the Community

Prior to forming PGI, from at least April 2019, if not earlier, through December 2019, Palafox served as a Director and President of a different multilevel marketing crypto firm ("Company 1"), which was essentially a PGI clone. Truslow Decl. at ¶¶ 7-8. Company 1 took in investor funds, claimed to engage in bitcoin trading, and promised daily returns similar to PGI. *Id.* ¶ 7. Also similar to PGI, at the end of the scheme, the owner of Company 1 appears to have stopped paying investors and restricted their ability to withdraw or claim their funds. *Id.*[4]

Palafox resigned from Company 1 in December 2019 and immediately began to build and pitch PGI. *Id.* ¶ 8. Based upon marketing and other materials obtained from a search warrant, it is apparent that Palafox used Company 1 marketing and promotional materials as the basis for PGI marketing materials. *Id.* His sales pitch for PGI mirrored that used by Company 1. *Id.* As explained by Special Agent Truslow, in certain instances, Palafox also used Company 1's formation documents, licensure(s), and accounts in forming and operating PGI. *Id.* He changed the names from Company 1 to PGI. Effectively, Palafox rebranded Company 1 as PGI. He then replicated the same pattern that had been executed by Company 1's CEO. He took in millions of dollars and then stopped paying investors. Palafox's apparent prior involvement in similar fraud schemes raise substantial concerns for the Government. Moreover, witnesses have expressed their belief that Palafox is behind new MLM scams. *Id.* at ¶ 44. Palafox and/or associates of Palafox have pitched the new schemes to victims of Palafox's PGI scheme, and the new schemes appear to have marked similarities with PGI. *Id.* Moreover, because of the online nature of these frauds, they can be executed from anywhere in the world.

---

[4] Company 1's founder and CEO was subsequently charged by the Securities and Exchange Commission for operating a cryptocurrency Ponzi scheme relating to the company he operated prior to establishing Company 1.

9

Ultimately, even if the Court disregards Palafox's prior and post PGI conduct, the scope and success of PGI itself raise substantial concerns about Palafox's danger to the community. Palafox executed a complex cryptocurrency Ponzi that brought in by his own estimate at least $200 million from 90,000 "investors." The scope and success of Palafox's fraud speak volumes of his ingenuity and skill as a salesman. Palafox hosted online presentations, events, chat groups, videoconferences, and in-person presentation to acclaim and success. ECF 1, Indictment at ¶ 19. He hosted lavish spectacles in glamorous locales like Dubai and Las Vegas, including outings on yachts and a desert safari. *Id.* at ¶ 21. He created an "online investor portal" that continued to misrepresent to investors the status and security of their investors even after he had stopped making payments. *Id.* at ¶ 26. These skills highlight both Palafox's technical acumen and savvy, and the danger that he poses to the community if released.

The case law makes clear that economic harm is a viable basis for a claim of danger to the community. As the Ninth Circuit held in *United States v. Reynolds*, "danger may, at least in some cases, encompass pecuniary or economic harm." 956 F.2d 192, 192 (9th Cir. 1992). The Ninth Circuit reiterated this point in *United States v. Lindsey*, 680 F. App'x 563 (9th Cir. 2017), holding that the district court did not act improperly when it determined that a defendant, who was found guilty in a trial of wire fraud and aggravated identity theft in a $2.3 million fraud, posed an economic danger to the community. While the present case involves a pre-trial posture, and thus the burden is the government's, the total fraud losses in this case far exceed those in *Lindsey*, which the Ninth Circuit found to be sufficient to justify a claim of pecuniary harm. Moreover, the present case is not one where the defendant would be deterred by the public nature of the indictment or the charges. There has already been significant public reporting about PGI and its fraudulent nature, as well as about the MLM cryptocurrency Ponzi scheme that Palafox was involved in prior

to PGI. Notwithstanding this publicity, according to witness, Palafox appears to have pitched investors on similar schemes after PGI, which raises substantial concerns that he is conducting or may conduct similar scams.

## V.  **CONCLUSION**

In light of the defendant's substantial fraud conduct, extensive overseas ties and assets, extensive history of hiding assets, attempts to monitor the progress of arrest warrants and by extension the Government's investigation, and seeming ongoing involvement in similar frauds, the United States respectfully submits that no condition or combination of conditions can reasonably assure his presence at trial, and that this Court should therefore order pretrial detention. In the alternative, the Government requests that the defendant be required to provide a multi-million dollar secured bond and be subject to electronic monitoring, in addition to the standard conditions of release (such as the surrender of his passport, and geographic limitations on travel).

Respectfully submitted,

ERIK S. SIEBERT
United States Attorney

_____/s_____
Jack Morgan
Zoe Bedell
Assistant United States Attorneys
2100 Jamieson Ave.
Alexandria, VA 22314
(703) 859-0500

## **CERTIFICATE OF SERVICE**

  I certify that on April 16, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF System, which will send notice of such filing to registered CM/ECF users on the docket of this case.

                      */s/*
                    Jack Morgan
                    Zoe Bedell
                    Assistant United States Attorneys
                    2100 Jamieson Ave.
                    Alexandria, VA 22314
                    (703) 859-0500