

FILED
IN OPEN COURT

SEP 1 6 2025

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RAMIL VENTURA Palafox,<br><br>a/k/a "RV Palafox,"<br><br>Defendant. | Case No. 1:25-cr-52 (LMB) |

STATEMENT OF FACTS

The United States and the defendant, Ramil Ventura Palafox (hereinafter, "the defendant" or "Palafox"), agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

1. Palafox is a dual citizen of the United States and the Philippines who principally resided in Las Vegas, Nevada.

2. Praetorian Group International was a Nevada company that purported to be an international bitcoin investment platform. Praetorian Group International was structured as a multilevel marketing company. Under such a structure, investors were promised additional bonuses and payments for recruiting other individuals to invest into the business.

3. Praetorian Group International and its domestic and international subsidiaries and/or affiliates, including but not limited to PGI Global UK, PGI Global, Praetorian Group International Trading, Inc., Praetors Global, and Praetorian Group International OÜ, are referred to collectively herein as "PGI" or "the firm."

4. Palafox owned and operated PGI and served as PGI's Chairman and Chief Executive Officer and chief promoter. In his capacity as PGI's CEO, Palafox directed and

controlled PGI's international network of affiliates, promoters, master distributors, employees, and agents. Palafox also controlled what investors were paid, when they were paid, and how they were paid.

5. PGI principally operated as an investment firm, and Palafox solicited investments from investors by representing that their funds would be used for bitcoin trading. Palafox falsely promised that investors would earn a 0.5 to 3% daily return on their investments. Between December 2019 and October 2021, at least 90,000 investors worldwide, including investors located in the Eastern District of Virginia, relying upon Palafox's fraudulent representations invested in PGI. In truth, PGI was a Ponzi scheme. Palafox was not trading bitcoin at a scale capable of making the promised returns; instead, he used investor money to pay other investors and to induce them to believe that their "investment" had been successful.

I. **The Wire Fraud Scheme**

6. Between approximately December 2019 and October 2021, in the Eastern District of Virginia and elsewhere, the defendant, Ramil Ventura Palafox, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowingly transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

7. It was the object of the scheme to obtain funds from investors. To do so, Palafox knowingly and willfully misrepresented and concealed material facts from investors and caused others to do the same. This included misrepresentations as to PGI's business activity, profitability, licensures, expected investment returns, ability to make investment payments, and use of investors'

funds, as set forth in greater detail below:

### A. *Palafox Marketed PGI to Investors in Virginia and Worldwide*

8. Palafox modeled PGI on Company 1, which purported to trade bitcoin and which promised daily returns similar to PGI. Palafox worked at Company 1 from at least December 2018 until December 2019, when he resigned after serving as the firm's International CEO. Months prior to Palafox's resignation, beginning in or about July 2019, the owner of Company 1 stopped paying investors and restricted their ability to withdraw of claim funds. After resigning from Company 1, Palafox used Company 1's marketing and promotional materials as the basis for PGI's marketing materials. Palafox also used Company 1's formation documents, licenses, and accounts as bases to form and operate PGI.

9. Beginning in January 2020, Palafox began to promote PGI, to recruit other promoters, and to solicit investments from victims. Towards this end, from that date through at least August 2021, Palafox hosted weekly online presentations and events, chat groups, and videoconferences, which were sometimes attended by hundreds of potential investors. The events were intended to convince victims to purchase PGI investment "packages" and to act as promoters for the scheme by recruiting others. Palafox referred to the investments as "packages" to avoid the regulatory scrutiny associated with investment products.

10. These promotional events were commonly translated into other languages and were distributed online to investors world-wide through social media. The theme of these presentations was obtaining financial independence and enabling victims to have what Palafox called "a bitcoin lifestyle," which he described as "you can have anything you want."

11. Most promotional events included the presentation of a PGI slide deck, which had been created by Palafox. While the presentation varied over time, it consistently described PGI

and the bitcoin investment scheme and contained materially false and misleading statements about PGI's operations and guaranteed daily returns. (The false representations commonly presented at the PGI presentations are described in greater detail in Section B below.) Palafox then distributed the presentations and sophisticated marketing videos to master distributors and promoters to further market PGI.

12.     Throughout the scheme, Palafox also used in-person events to persuade individuals to invest in PGI. PGI held events in the Eastern District of Virginia, including events in Alexandria and Norfolk, Virginia. While Palafox was not personally present at the events in the Eastern District of Virginia, promoters and representatives of PGI presented promotional materials, which had been prepared by Palafox, that included materially false representations. Palafox also held events in numerous other cities throughout the United States and internationally. The events often included lavish spectacles. At one event in the penthouse of a luxury hotel in Las Vegas, Nevada, Palafox brought out a cash cannon that shot money into the air. At another event in Dubai, Palafox hosted dozens of PGI promoters on a luxury yacht and desert safari. Videos from the event were then turned into promotional videos for PGI that were distributed through social media. Palafox used the events and locales to highlight PGI's purported success and prosperity and to induce victims to invest.

### B. *Palafox Lied to Investors that PGI Would Give Guaranteed Investment Returns and Would Double Their Money Within Six Months*

13.     Palafox falsely promised investors that their funds would be used to trade bitcoin, that investments generated guaranteed daily returns ranging from .5% to 3%, and that investors would double their money within six months. Palafox also falsely promised investors additional referral bonuses and commissions for successfully recruiting new investors. Once an investor had doubled their money, PGI claimed that it would provide additional bonuses to incentivize the

investor to roll their money over into a new investment package, thereby reducing investment withdrawals. Palafox represented that PGI could generate such remarkable returns because PGI employed multiple traders in the Philippines, who were successfully and extensively trading on Crypto Exchange 1 and Crypto Exchange 2. Palafox also represented that because PGI's supposed traders were so experienced and were using sophisticated trading strategies, such as "arbitrage trading" and the use of "arbitrage bots," that they were able to make money regardless of market conditions—that is, regardless of whether the price of Bitcoin went up or down.

14. As Palafox knew, each of the representations set forth in Paragraph 13 was false. PGI was not trading bitcoin in any sizeable quantity. The firm did not employ multiple traders in the Philippines. The firm was not trading cryptocurrency in any sizeable amount on Crypto Exchange 1 and Crypto Exchange 2. The firm never used "arbitrage" bots. Moreover, despite the claims made by PGI in the previous paragraph, the firm was not immune to market conditions.

15. Palafox received investors funds either in fiat currency or in cryptocurrency. In total, Palafox received more than $30 million in fiat currency from investors. Investors gave Palafox money by check, cash, and wire. Multiple investors were fraudulently induced by Palafox to travel from Virginia to Nevada to give him their investments in person. Rather than invest this money as he had represented, Palafox used the fiat funds to further promote the scheme, including by paying some investors with other investors' funds. The defendant also spent millions in fiat currency to finance his and his family's lifestyle.

16. Investors invested more than $201,000,000 in PGI, which included at least $30,295,289 in fiat currency and at least an additional 8,198 bitcoin (worth approximately $171,498,528). Investors transferred the bitcoin to wallets owned and/or controlled by Palafox, and gave Palafox the fiat currency in cash, check, and wires. To create the illusion that PGI was

transacting with a separate entity and complicate observer efforts to understand the movement and control of investor funds, Palafox received the bitcoin in one set of wallets and then transferred the bitcoin to a separate set of cryptocurrency wallets, which he controlled. The use of multiple wallets effectively enabled Palafox to falsely represent that PGI was "trading" and that the money was being "invested." When the term of the investment expired and Palafox had to pay the investors, he sent them back their own money or funds received from other investors. Palafox also kept some of the cryptocurrency. As a result of his fraudulent actions, Palafox caused investors to suffer losses totaling at least $62,692,007 and he agrees that they are entitled to restitution in that amount.

17. Palafox also represented that PGI had a diverse line of other products that helped to mitigate market risk and ensure that the company was profitable. The other supposedly profitable products included cryptocurrency ATMs, blockchain education, and health and wellness products. In truth, as Palafox knew, PGI did not make any money from its cryptocurrency ATMs and blockchain education, and it made minimal money from its health and wellness line.

18. Palafox also represented that certain investors' investments were insured by Company 2. In truth, as Palafox knew, none of the investments were insured.

C. *Palafox Falsely Represented that PGI Complied with Applicable Laws in the United States and Other Countries*

19. To persuade investors that their money was safe and secure, Palafox falsely represented that PGI was in compliance with applicable laws in the countries where it operated, including the United States. He also falsely represented that PGI had obtained relevant licensures to operate in the Philippines and to trade cryptocurrency in Estonia.

20. In truth, as the defendant knew, PGI was not licensed to sell financial products in the United States. PGI's Filipino affiliate, Praetorian Group International Trading Inc, was not

permitted to solicit, accept or take investments or investment contracts from the public. Lastly, PGI's Estonian affiliate, Praetorian Group International OÜ, did not have a virtual currency trading license or virtual currency exchanger licenses in Estonia.

### D. *Palafox Misled Investors as to the Profitability of Their Investments and Their Ability to Withdraw Profits*

21. Palafox maintained a website promoting PGI and providing a means for investors to supposedly monitor their investments. After a victim purchased an investment package, the victim received access to an individual account on the PGI website where the victim could log on and view the purported gains on the investments (the "PGI online portal"). From 2020 through 2021, Palafox caused the PGI online portal to consistently and fraudulently indicate that victims' investments were gaining value. As a result of these misrepresentations, victims believed that their investments were profitable and secure.

22. Throughout the course of the scheme, Palafox controlled what investors were paid, when they were paid, and how they were paid. Palafox told his victims that they could use the PGI online portal to make weekly withdrawals of their earnings. In reality, by least as early as January 2021, Palafox stopped timely paying investors. This prompted thousands of investors to send video, voice, and text messages complaining, and warning about the severe financial consequences to their families of the non-payments. In response, Palafox falsely represented that PGI was having technical difficulties with its payment processors, and he promised that PGI would eventually pay victims what they were owed. Between February 2021 and June 2021, Palafox told victims that PGI had formed relationships with two new payment processing companies, Company 3 and Company 4, and that those companies would facilitate payments. In truth, as he knew, Palafox never provided either Company 3 or 4 with funds sufficient to support investors' withdrawal requests, and these companies were never a means of providing meaningful refunds.

23. Despite the fact PGI was not trading in a sizeable amount and was not paying investors, Palafox continued to accept millions of dollars in new investments in 2021 and continued to promise investors that PGI would pay investors .5 to 3 percent daily guaranteed returns.

E. *Use of the Wires*

24. On or about the dates specified as to each count below, in the Eastern District of Virginia and elsewhere, the defendant, Ramil Ventura Palafox, for the purpose of executing, and in furtherance of, the aforesaid scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did knowingly transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, as more specifically described below, each count being a separate offense:

| Count | On or About Date | Description of Wire |
|---|---|---|
| 6 | March 19, 2021 | $200,257 transmitted from INVESTOR 2's Bank of America account to Palafox's JPMC account ending 6066 through servers inside the Eastern District of Virginia and outside Virginia |

(All in violation of 18 U.S.C. § 1343.)

II. **The Money Laundering Scheme**

25. Palafox also used investor funds to fraudulently promote PGI, pay other victims and promoters, and fund his extravagant personal expenses.

26. For example, in February 2021, Palafox held a promotional event in Dubai. This event was intended to reinvigorate excitement about PGI despite the repayment problems the company had been having. Palafox invited investors and potential investors and spent hundreds of thousands of dollars on the lavish event. This event was funded using money received from victims

for investments. Similarly, in June 2021, after months of failing to pay his investors, Palafox held an online rebranding event in which he announced an initiative he called PGI 2.0. Palafox continued to solicit and accept investments after both of these events.

27. Palafox spent money on expenses that served both personal purposes and to promote the fraudulent scheme. He spent approximately $3 million on 20 luxury vehicles, including automobiles by Porsche, Lamborghini, McClaren, Ferrari, BMW, Bentley, and others. Palafox brought these vehicles to promotional events to support the illusion of PGI's profitability and success. Palafox also spent approximately $329,000 on penthouse suites at a luxury hotel chain with locations in Las, Vegas, NV and Beverly Hills, CA to support the illusion of PGI's profitability and success.

28. Palafox also used millions of dollars of investor money to fund his personal expenses. He purchased four homes in Las Vegas and Los Angeles worth more than $6 million. For example, in October 2020, he spent over $1.3 million to purchase a residence in Nevada using funds he had received from investors. The home was titled in the name of Palafox and his wife, and in June 2021 was transferred to a company, which Palafox controlled, but which was nominally owned by two family members. In January and February 2021, he purchased another residence in California in his and his wife's names for approximately $1.7 million using investor funds, and later transferred titled to the same nominee company. Palafox also transferred over a million dollars to accounts that he owned and/or controlled overseas in Philippines.

29. Palafox also spent at least $3 million in investor money to buy clothing, watches, jewelry, and home furnishings at luxury retailers, including Louboutin, Neiman Marcus, Gucci, Versace, Ferragamo, Valentino, Cartier, Rolex, and Hermes, among others. He also transferred at least $800,000 in fiat currency, plus an additional 100 bitcoin, then valued at approximately $3.3

million, to one of his family members.

30. Palafox concealed the location, source, origin, ownership, and control of much of the investment proceeds fraudulently obtained from victims by commingling and cycling victim funds through numerous bank accounts, cryptocurrency wallets, cryptocurrency exchanges, and other services.

31. Palafox also directed victim funds to be sent to a bank account in the name of Company 5, whose name had no relation to the name of PGI and which had been formed for the purported purpose of conducting real estate transactions. Palafox used this account to avoid financial institution scrutiny. He also transferred funds between different accounts and purchased items in the names of his family members.

32. Lastly, on or about September 24, 2021 in the Eastern District of Virginia and elsewhere, the defendant, Palafox did knowingly conduct and attempt to conduct a financial transaction, that is a $200,000 wire transfer from Palafox's son's JPMC account ending 7691 to Palafox's Union Bank of the Philippines account, affecting interstate and foreign commerce, which in fact involved the proceeds of specified unlawful activity, that is, wire fraud in violation of 18 U.S.C. § 1343, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transaction, the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

(All in violation of 18 U.S.C. § 1956(a)(1)(B)(i).)

### III. Conclusion

33. This statement of facts includes those facts necessary to support the plea agreement

between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

34. This Statement of Facts is effective when signed by the defendant, the defendant's attorney, and an attorney for the United States. The defendant waives any right to claim that statements made within this Statement of Facts should be excluded or suppressed under Fed. R. Evid. 410, Fed. R. Crim. P. 11(f), the Sentencing Guidelines, or any other provision of the Constitution or federal law.

35. The actions of the defendant, as recounted above, were in all respects knowing, willful, and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

Date: <u>August 6, 2025</u>

Erik S. Siebert
United States Attorney

_____
Jack Morgan
Assistant United States Attorney


_____
Zoe Bedell
Assistant United States Attorney

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, Ramil Ventura Palafox, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
RAMIL VENTURA Palafox

I am Nate Wenstrup, defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Nate Wenstrup, Esq.
Attorney for Ramil Ventura Palafox